Marcelino Méndez Arocho et als., demandantes y recurridos, *v.* El Vocero de Puerto Rico et als., demandados y peticionarios.

*Número:* CE-89-62　　　　　*Resuelto:* 29 de junio de 1992

868

*Juan R. Marchand Quintero* y *José E. Colón Rodríguez*, de *Rivera Cestero & Marchand Quintero*, abogado de los peticionarios; *Víctor J. Estrella Hernández*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante petición de *certiorari*, recurre ante este Tribunal *El Vocero de Puerto Rico, Inc.* (en adelante El Vocero) para que revoquemos la resolución interlocutoria dictada por el Tribunal Superior, Sala de Aguadilla, que denegó su solicitud para que se resolviera la controversia mediante sentencia sumaria. El presente recurso nos permite estudiar y analizar un asunto nunca antes resuelto en Puerto

Rico: el reconocimiento y alcance en nuestra jurisdicción del derecho a una acción por daños y perjuicios por la difamación de personas ya fallecidas. Revocamos.

I

La demanda que dio origen al caso de autos fue motivada por la publicación, el 5 de noviembre de 1986, de una noticia en el periódico El Vocero, en la cual se reportaba el asesinato del Sr. Heriberto Méndez Pérez. El encabezamiento de la noticia se leía como sigue: "Matan homosexual en motel." Debajo de él se reprodujo una foto de la persona asesinada, tal y como lucía en el lugar de los hechos. En el texto de la noticia se indicó que la policía adjudicó el asesinato "a un hecho pasional entre homosexuales". A pesar de que el hombre asesinado no fue identificado por su nombre, se describió como de tez blanca, de 28 años de edad, delgado, con bigote y de unos 5 pies y 9 pulgadas (5'9"); además, su rostro se podía ver en la foto. La noticia es leída como sigue:

> Aguadilla - La cabaña número cinco de el Motel El Girasol ubicado en la Carretera 110 fue escenario ayer de un horrendo crimen el cual la policía adjudica a un hecho pasional entre homosexuales y donde un joven de 28 años, desnudo, excepto por sus medias, recibió 10 puñaladas.
>
> El occiso, delgado, blanco, con bigote y de unos cinco pies nueve pulgadas, hasta ayer no había sido identificado. Esto se debió a que el asesino, quien se sospecha es mayor que su víctima, se llevó toda la ropa de éste donde posiblemente hubiera alguna identificación.
>
> En el lugar de los hechos, la policía halló dos pares de pantaloncillos, los de la víctima y el asesino, dos pares de zapatos, y unos espejuelos. La víctima recibió puñaladas en las manos, como si hubiese tratado de defenderse. En el torax tenía una puñalada que le llegó al corazón; otra en el mollero derecho y otra bajo el estómago. Otras heridas las recibió en la espalda.
>
> Los empleados del Motel a cargo de la limpieza, Juan Ramos y Juan M. Santos, dijeron que observaron cuando llegaron al Motel dos personas a eso de las 9:05 P.M., en un pequeño

automóvil. Que pidieron dos cervezas y que como a las 9:45 P.M. uno de los empleados notó que alguien de la cabaña 5 salía a toda prisa por lo que éste tomó el número de tablilla que era el AAM-592. Cuando el empleado creía que los clientes se habían marchado, fue a hacer la limpieza y se encontró con el cuerpo ensangrentado tirado boca abajo en el piso, al igual que manchas de sangre en todo el lugar. Llamaron a la policía y acudieron los policías Antonio Cordero y José Villanueva, quienes se comunicaron con la sección de homicidios del CIC. Los agentes Ramón Cardona Santares y Félix Hernández comenzaron la pesquisa a la que se unió el Fiscal Nicolás Rivera.

La policía conjetura que la víctima fue apuñalada estando en la cama y cuando trató de ir hacia el cuarto sanitario el agresor le siguió dando puñaladas hasta que cayó entre el cuarto dormitorio y la entrada al baño, [sic] el Fiscal Rivera ordenó el envío del cadáver para la autopsia al Instituto de Medicina Legal de Río Piedras. Apéndice, págs. 00020–00021.

El 20 de julio de 1987, el padre y los hermanos del occiso Heriberto Méndez Pérez, presentaron una demanda contra El Vocero, en la cual alegaron que la noticia les causó "grandes sufrimientos y angustias mentales a los demandantes, quienes son sus familiares inmediatos y quienes han tenido que soportar las burlas públicas hechas a la memoria del occiso provocadas por la información falsa y libelosa de El Vocero". Apéndice, pág. 00049. A su vez, rechazaron la imputación de homosexualidad del occiso aseverando que "era un hombre completamente masculino y durante su vida nunca di[o] apariencia ni estuvo envuelto en actividad homosexual alguna". Íd., pág. 00048. Por ende, negaron "que el asesinato fuera resultado de un hecho pasional entre homosexuales". Íd., pág. 00049. Alegaron, además, que del expediente policial no surgían los hechos homosexuales imputados y que "no se lograba ningún propósito educativo ni de beneficio alguno a la sociedad con la imputación de homosexualidad a Heriberto Méndez Pérez". Íd.

En su contestación a la demanda, El Vocero negó todas las alegaciones y adujo, entre otras defensas afirmativas, que la demanda no exponía hechos constitutivos de una

causa de acción, que el artículo publicado no era falso y se ajustaba a lo realmente acontecido; que no se incurrió en negligencia o se tuvo la intención de desacreditar la memoria del occiso o causar daños a los demandantes, y que el artículo fue publicado "en el ejercicio de la libertad de prensa" garantizado por el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Apéndice, pág. 00045.

Luego de varios incidentes procesales en torno al descubrimiento de prueba, el 15 de agosto de 1988 El Vocero presentó una solicitud de sentencia sumaria. Ese mismo día el tribunal de instancia le concedió un término a la parte demandante para que mostrara causa por la cual no debía dictarse sentencia sumaria a favor de la demandada. Por su parte, el 19 de septiembre de 1988, la parte demandante se opuso a la solicitud de sentencia sumaria y solicitó que se dictara sentencia sumaria parcial a su favor. En esta moción señaló que "en el presente caso no existe controversia real de hechos en cuanto a la negligencia de la parte demandante al publicar una falsedad difamatoria". Apéndice, pág. 00016. Sin embargo, no acompañó la moción con documento alguno, declaración jurada o interrogatorio para derrotar la sentencia sumaria de la otra parte. Mediante Resolución de 14 de octubre de 1988, el tribunal de instancia declaró sin lugar ambas solicitudes. Posteriormente, El Vocero presentó una solicitud de reconsideración, la cual fue rechazada de plano.

Mediante solicitud de *certiorari*, acude ante nos la parte demandada, El Vocero, y alega que erró el tribunal de instancia "al entender que existía controversia real sobre los hechos materiales del caso" (Solicitud de *certiorari*, pág. 3) y al resolver "que como cuestión de derecho, al periódico peticionario no le asiste el derecho a que se dicte sentencia desestimatoria a su favor". Íd.

## II

La Regla 36.2 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) permite a la parte demandada en un pleito solicitar, en cualquier momento, que se dicte sentencia sumariamente a su favor sobre parte o la totalidad de la reclamación.

El propósito de esta solicitud es *"acelerar la justicia que persigue el litigante obligando a la parte contraria a presentar al tribunal las pruebas que tenga para sostener las alegaciones que ha hecho*, y evitando que a base de meras manifestaciones en un escrito pueda estar un pleito en un tribunal hasta tanto éste pueda ir a un juicio en sus méritos y dilucidarse entonces la controversia de hechos". (Énfasis suplido.) R. Hernández Colón, *Manual de Derecho Procesal Civil*, Hato Rey, Ed. Equity, 1981, Sec. 2613, pág. 203. Véase, también, 10 *Wright, Miller and Kane, Federal Practice and Procedure 2d* Sec. 2712 (1983). De esta manera se aligera el proceso judicial y se termina el pleito sin tener que celebrar un juicio en su fondo. *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272 (1990). Así, se cumple con el propósito de nuestro ordenamiento procesal vigente: garantizar una solución justa, rápida y económica. Regla 2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. El buen uso procesal de la sentencia sumaria es un valioso mecanismo procesal para descongestionar los calendarios judiciales. *Padín v. Rossi*, 100 D.P.R. 259, 263 (1971).

Las Reglas de Procedimiento Civil disponen que la parte que se opone a que se dicte sentencia sumaria en su contra viene obligada a contestar de forma detallada y específica, y *no podrá descansar sólo en las aseveraciones o negaciones que hizo en las alegaciones.* Así, está obligada a demostrar la existencia de una controversia real de hechos que amerite que se celebre un juicio en su fondo. 32 L.P.R.A. Ap. III, R. 36.5. Una vez el tribunal tiene ante sí

todos los documentos, debe analizar los hechos en la forma más favorable a la parte que se opone a que se dicte la sentencia sumariamente y, además, presumir como ciertos todos los hechos no controvertidos. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 721 (1986).

■ A la luz de estos criterios, la solicitud de sentencia sumaria debe ser acogida por el tribunal, y éste procederá a dictar sentencia a favor de la parte que la solicita "si las alegaciones, ...[deposiciones], contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren *que no hay controversia real sustancial en cuanto a ningún hecho material y que como cuestión de derecho debe dictarse sentencia sumaria* a favor de la parte promovente". (Énfasis suplido.) 32 L.P.R.A. Ap. III, R. 36.3. Esto es, el tribunal debe quedar convencido de la inexistencia de una controversia sobre los hechos materiales y de que lo que resta es aplicar el derecho. *Roig Com. Bank v. Rosario Cirino*, 126 D.P.R. 613 (1990); *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83, 86 (1987); *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 720.

■ Este mecanismo procesal es especialmente deseable en aquellos casos en que se encuentra involucrada la libertad de expresión, pues la prolongación de estos pleitos puede tener un efecto paralizante o disuasivo (*chilling effect*) sobre el ejercicio de este derecho fundamental. Véanse: *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 182 (1978); *Oliveras v. Paniagua Diez*, 115 D.P.R. 257, 269 (1984); Smolla, *Law of Defamation*, Sec. 1207(1)(b) (1992). A tenor con esto, hemos dicho que el procedimiento de sentencia sumaria "es una parte integral de la protección constitucional disponible a los demandados en este género de litigio". *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 696 (1984).

■ Una vez la parte demandada presenta prueba que avale una de sus defensas, la parte demandante viene obligada a presentar prueba que controvierta la presentada por la parte demandada. Si la parte demandada presenta prueba de que se trata de una figura o funcionario público y que claramente, *prima facie*, actuó sin malicia y sin grave menosprecio a la verdad entonces "el demandante tiene el deber de producir prueba, en la etapa de la sentencia sumaria, sobre hechos materiales respecto a los cuales no exista controversia real sustancial y que, de ser probados en un juicio plenario, establecerían la existencia de malicia real por parte del periódico en la publicación de la noticia libelosa". (Énfasis suprimido.) *Villanueva v. Hernández Class*, 128 D.P.R. 618 (1991). Véase *García Cruz v. El Mundo, Inc.*, supra, y los casos allí citados. Sobre el tema, véanse: *Wright, Miller and Kane*, supra, Vol. 10A, Sec. 2730; Comentarios, *The Use of Summary Judgments in Defamation Cases*, 14 U.S.F.L. Rev. 77 (1979); Sanford, *Libel and Privacy*, Sec. 13.3.2, págs. 637–641 (1991). De otra parte, si se presenta prueba de que se trata de una persona privada, y no se actuó de forma negligente, el demandante viene obligado a contrarrestar la prueba con otra que demuestre que hubo negligencia. Es por eso que se ha exigido una observancia más estricta de los requisitos de las reglas sobre sentencias sumarias.

En el caso de autos, el foro de instancia emitió una resolución donde dispuso que "[l]uego de estudiar dichos escritos, este Tribunal declara sin lugar ambas solicitudes de sentencia sumaria por entender que existe una controversia real de hechos y de derecho en este caso". Apéndice, pág. 00011.

Como vemos, el tribunal a quo no señaló las controversias de hechos sustanciales que a su entender debían ser examinadas en un juicio plenario. Estando en la misma posición y examinadas ambas solicitudes de sentencia sumaria, resolvemos que no existen controversias de hechos

sustanciales que recaigan sobre los hechos materiales que de alguna manera hubieran impedido al tribunal de instancia dictar la sentencia sumaria solicitada.

## III

■ El Código de Enjuiciamiento Civil de Puerto Rico estableció desde el 19 de febrero de 1902 el derecho de las personas a promover una acción civil por los daños y perjuicios causados por expresiones libelosas en su contra. Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3141 *et seq.*

Sin embargo, desde 1952, la fuente primaria de protección contra injurias es la Constitución del Estado Libre Asociado de Puerto Rico. Ésta reconoce el derecho de "[t]oda persona ... a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Art. II, Sec. 8, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 292. Como ley suprema de nuestro país, la Constitución desplaza a la Ley de Libelo y Calumnia de 1902, y ésta última "sobrevive tan sólo en cuanto es compatible con la Constitución". *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734, 738 (1975). Véanse: *García Cruz v. El Mundo, Inc.*, supra; *Clavell v. El Vocero de P.R.*, supra, pág. 690. Por lo tanto, "no es necesario legislar como condición al ejercicio de los derechos que esta sección establece. *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812 (1964)". *Cortés Portalatín v. Hau Colón*, supra, pág. 738.

Por la naturaleza de esta acción, generalmente nos enfrentamos a una colisión entre dos derechos que nuestra Constitución reconoció como fundamentales: la libertad de prensa y la protección contra ataques abusivos a la honra y reputación de las personas y a su vida privada o familiar. Const. E.L.A., *supra*, Secs. 4 y 8; *Clavell v. El Vocero de P.R.*, supra, pág. 691.

El conflicto entre estos derechos fundamentales obliga a

un análisis ponderado de los intereses implicados y a la adopción de normas que permitan soluciones adecuadas.

■ El Código de Enjuiciamiento Civil define libelo como:

> Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios ... o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar a los parientes y amigos sobrevivientes. Sec. 2 de la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3142.

■ Nuestra jurisprudencia sobre libelo o calumnia se ha desarrollado en torno a pleitos trabados por personas en vindicación de los derechos que alegan han sido violados por otros. En la mayoría de estos casos los demandantes alegaban haber sufrido un daño a su reputación o a su intimidad, a raíz de las expresiones difamatorias hechas contra ellos por los demandados. Así, respecto a la acción civil por libelo o difamación hemos resuelto que para que esta prospere deben probarse la falsedad de la información y los daños reales sufridos a causa de esta. *Maldonado y Negrón v. Marrero y Blanco*, 121 D.P.R. 705 (1988); *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37 (1988). Además, si el demandante es una figura privada, debe probar que las expresiones fueron hechas de manera negligente.[1]

---

[1] El tribunal, al determinar la existencia de negligencia, deberá considerar los factores siguientes:

1. La naturaleza de la información publicada, la importancia del asunto que trata y especialmente si ésta es difamatoria de su propia faz y puede preverse el riesgo de daños.

2. Origen de la información y confiabilidad de su fuente.

3. Razonabilidad del cotejo de la veracidad de la información tomando en consideración el costo en términos de dinero, tiempo, personal, urgencia de la publicación, carácter de la noticia y cualquier otro factor pertinente. Véase *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 425 (1977).

*Ocasio v. Alcalde Mun. de Maunabo*, supra; *Oliveras v. Paniagua Diez*, supra, pág. 262.

Si, por el contrario, la persona alegadamente difamada es una figura pública, aplicará la norma más estricta de malicia real procedente de *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Así, deberá probar que las expresiones fueron hechas con grave menosprecio de la verdad. *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1985); *Pueblo v. Olivero Rodríguez*, 112 D.P.R. 369 (1982); *García Cruz v. El Mundo*, supra; *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432 (1977).

## IV

En el caso de autos nos enfrentamos a la misma materia desde una perspectiva diferente: la causa de acción que concede la Sec. 2 de la Ley de Libelo y Calumnia es por *"cualquiera difamación maliciosa publicada ... con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar a los parientes y amigos sobrevivientes"*. 32 L.P.R.A. sec. 3142.[2]

Surge del texto de la ley, que será necesario demostrar que la difamación maliciosa publicada se hizo con la intención de denigrar o deprimir la memoria de un muerto. Además, como elemento copulativo se requiere demostrar que se quiso hacer con la intención de desacreditar o provocar a los parientes y amigos sobrevivientes.

Distinto es el análisis que debe configurarse cuando se trata de una difamación de una persona privada.

---

[2] También en la esfera penal constituye delito "[t]oda persona que maliciosamente a través de cualquier medio, o de cualquier modo ... denigrare la memoria de un difunto, será sancionada con pena de ... multa que no excederá de quinientos (500) dólares, pena de restitución, o cualquier combinación de éstas, a discreción del tribunal". Art. 118 del Código Penal de 1974 (33 L.P.R.A. sec. 4101). Para un análisis de la experiencia en Estados Unidos, véase P. Lewis, *Gatley on Libel and Slander*, 8va ed., Londres, Ed. Sweet and Maxwell, 1981, Núm. 8, Sec. 1594, pág. 648.

En ese caso al examinar el estatuto de 1902 hemos dicho que "por ausencia del ingrediente de malicia, no quiere decir que el demandante no sea acreedor en ley a un resarcimiento en otro concepto. Dispone el Art. 1802 del Código Civil —Ed. 1930— que el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". (Énfasis suprimido.) *Romany v. El Mundo, Inc.*, 89 D.P.R. 604, 618 (1963). Es claro el reconocimiento de una causa de acción por negligencia bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, cuando se trata de personas privadas que a su vez no sean personas o funcionarios públicos.

■ La Ley de Libelo y Calumnia, al establecer una causa de acción por difamación sobre una persona fallecida, no sólo requirió malicia sino que incluyó el ingrediente de intención. Ahora bien, la parte demandante no puede descansar en una alegación de mera negligencia. Su prueba debe estar dirigida a demostrar, mediante preponderancia de la prueba, que el demandado actuó de manera intencional o con negligencia crasa y grave menosprecio de la verdad al querer denigrar o deprimir la memoria de un muerto y, a su vez, querer desacreditar o provocar a los parientes y amigos sobrevivientes.

■ Nuestro análisis no debe estar supeditado al establecimiento de nuevas clasificaciones de personas fallecidas privadas o de figuras públicas fallecidas. El alcance de esta protección trasciende los criterios objetivos que la jurisprudencia se ha encargado de delinear para resolver las controversias sobre difamación entre las personas vivas. Se trata pues, de un análisis ponderado de los intereses en conflicto entre el ejercicio de la prensa en informar los eventos públicos y el derecho de los familiares y amigos sobrevivientes de un muerto de protegerse contra una difamación.

En Estados Unidos, en ausencia de un estatuto que

reconozca expresamente este derecho, los tribunales tienden, en su mayoría, a rechazar las acciones por difamación de los muertos.[3] Algunos de los fundamentos que se esgrimen para rechazar esta causa de acción son: (1) que la causa de acción es de naturaleza personal y no sobrevive a la muerte;[4] (2) que el alcance de esta acción sería difícil de determinar, o (3) que permitir la causa de acción por difamación de los muertos afectaría la investigación de la historia. Nota, *Dead but Not Forgotten: Proposals for Imposing Liability for Defamation of the Dead*, 67 Tex. L. Rev. 1525, 1530 (1989). Véase, además, W.P. Armstrong, *Nothing But Good of the Dead?*, 18 A.B.A. J. 229 (1932).

Otro fundamento utilizado en algunas jurisdicciones norteamericanas en contra del reconocimiento de la acción por difamación de los muertos, es el potencial efecto paralizante de la libertad de expresión. Es decir, que por temor a ser demandados y finalmente condenados al pago de cuantiosas sumas, los medios noticiosos podrían verse coartados en su derecho a expresarse libremente. Véase, en general, Nota, *The Chilling Effect in Constitutional Law*, 69 Colum. L. Rev. 808, 825–826 (1969).

## V

En el caso de autos, al sopesar los intereses implicados debemos analizar con detenimiento las circunstancias que rodearon la muerte del Sr. Heriberto Méndez Pérez y la publicación de su horrendo asesinato.

El 3 de noviembre de 1986, en la cabaña número cinco (5) del Hotel El Girasol en Aguadilla, unos agentes de la

---

[3] Véase B.W. Sanford, *Libel and Privacy*, 2da ed., Nueva Jersey, Prentice Hall Law and Business, 1991, Sec. 4.4, pág. 101.

[4] En algunos estados la acción por difamación se considera como personalísima bajo la premisa de que la reputación es un derecho personal. Por esto se dice que los parientes de un muerto difamado no pueden recobrar por la difamación de éste. Nota, *Dead but Not Forgotten: Proposals for Imposing Liability for Defamation of the Dead*, 67 Tex. L. Rev. 1525, 1532–1533 (1989).

Policía de Puerto Rico encontraron un cuerpo de hombre muerto en medio de un charco de sangre. Apéndice, págs. 00039–00040, *Informe Policial*, de 3 de noviembre de 1986. (Documento que acompaña la moción de sentencia sumaria de los demandados.) En el momento de la investigación se desconocía la identidad de la víctima. Este informe fue suplementado por otro de 27 de mayo de 1987. El policía Félix Hernández Pellot relata las condiciones en las que se encontró al muerto. "El cuarto estaba con las luces encendidas. Presentaba Sangre en abundancia en el Suelo. ... Sobre la mesa había dos botellas de Cerveza marca Hein[e]ken que tenían casi la mitad ....[D]ebajo de la mesa hab[í]a un par de zapatos de cuero color crema. Debajo del cajón donde se cobra había un par de zapatos negro[s]. Dos pantaloncillos color blanco y un par de media[s] de hombre. La cama estaba desordenada[, ] el matre casi descubierto .... El Cuerpo de la víctima estaba bocà [a]bajo desnudo sobre un charco de Sangre." Apéndice, pág. 00042. (Este documento se incluyó en la solicitud de sentencia sumaria de la parte demandada.) También se incluyó tres (3) páginas de una deposición que le tomaron al policía Félix Hernández Pellot, de la cual surge que el occiso llegó al motel acompañado de otro hombre y que pidieron dos (2) cervezas.

Ahora bien, con toda esta información el periódico El Vocero publicó la noticia que titulaba "Matan homosexual en Motel". En esa noticia, el periódico señaló que la policía adjudicaba estos hechos a un crimen pasional entre homosexuales. Veamos.

Por su parte, los demandantes sostienen que el periódico fue negligente y que la información de la noticia es falsa. Sin embargo, con su solicitud de sentencia sumaria parcial no se incluyó documento alguno que demostrara la intención del periódico de difamar o que este último actuó con negligencia crasa y grave menosprecio de la verdad.

Aquí no se trata de una información remota o descar-

nada, en la que se hace referencia a hechos pasados. Más bien, se refiere a un recuento de la información que la Policía recopila de eventos contemporáneos rodeados de unas circunstancias muy peculiares de los cuales la parte demandada infiere razonablemente los hechos publicados.

 Afirmamos que la prensa, en el desempeño de sus funciones, no puede estar sujeta a limitaciones que le impidan hacer conclusiones o inferencias razonables de los hechos que día a día informan. Esta cualidad es consubstancial con la protección constitucional a la prensa que le concede el Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, y la Primera Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1.

Sin embargo, esto no significa que un periódico pueda difamar de manera intencional o con negligencia crasa, deprimiendo así o denigrando la memoria de un muerto y desacreditando o provocando a los parientes y amigos sobrevivientes. El así hacerlo activaría la protección legal que la Ley de Libelo y Calumnia otorga a los familiares y amigos sobrevivientes de un muerto. Hemos dicho que "[e]l ejercicio de este derecho debe hacerse en forma moralmente responsable. La Convivencia civil y democrática presupone que no se abusará de los derechos". *Aponte Martínez v. Lugo*, 100 D.P.R. 282, 290 (1971).

En este caso, El Vocero utilizó la información que la Policía le había provisto para la cobertura de este asesinato. Las circunstancias particulares que rodearon este suceso no impedían al rotativo hacer las inferencias razonables del acto sangriento ocurrido esa noche en el Motel El Girasol. Definitivamente, la muerte constituye un hecho vital que concierne a todos aquellos que seguimos en este derrotero de la vida.

No habiendo la parte demandante demostrado que cuenta con prueba para controvertir la prueba del deman-

dado y demostrar que se actuó de manera intencional o con negligencia crasa y grave menosprecio de la verdad, revocamos.

Por los fundamentos antes expresados, *expedimos el auto de "certiorari" presentado y se dictará sentencia revocatoria de la resolución recurrida, que declare en consecuencia sin lugar la demanda Marcelino Méndez Arocho et al. contra el demandado "El Vocero de Puerto Rico, Inc.".*

La Juez Asociada Señora Naveira de Rodón emitió un voto particular y de conformidad. Los Jueces Asociados Señores Alonso Alonso y Fuster Berlingeri emitieron sendas opiniones disidentes.

— O —

Voto particular y de conformidad emitido por la Juez Asociada Señora Naveira de Rodón.

Creemos importante hacer constar que con relación al análisis que hay que hacer con respecto a la negligencia en la publicación de noticias por los medios noticiosos, el factor tiempo es uno de gran relevancia.

Los medios noticiosos, en ocasiones, ofrecen la información al público mientras los incidentes o eventos se están desarrollando;[1] otras veces ofrecen la información inmediatamente después de haber ocurrido o tan pronto les sea posible. Un reportaje efectivo, como regla general, es uno que se efectúa poco tiempo después de haber ocurrido el incidente o evento. En estas circunstancias, la responsabilidad de los medios se circunscribe a que reporten los hechos según éstos los perciben en esos momentos, pudiendo, claro está, hacer deducciones lógicas de estos hechos. Hay que tener en cuenta que la corroboración en muchas oca-

---

[1] Esto sucede a menudo con relación a la televisión y la radio.

siones puede ser difícil o imposible. Por lo tanto, el que se haya publicado una información falsa no significa, *ipso jure*, que se haya incurrido en negligencia. Tampoco se incurre en negligencia si de unos hechos se llega a una conclusión, que aunque lógica y razonable, resulte, luego de una investigación más prolongada, ser falsa.

En el caso de autos, los hechos que dieron fundamento al reportaje objeto de este pleito surgieron de informes oficiales de la Policía. De ellos surgían hechos de los cuales se podía razonablemente deducir lo reportado por el periódico *El Vocero de Puerto Rico*. En estas circunstancias y tomando en consideración lo antes expuesto, somos de la opinión que los demandantes no pudieron oponerse efectivamente a la moción de sentencia sumaria de los demandados presentando prueba para avalar siquiera una determinación de negligencia bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, independientemente de la Ley de Libelo y Calumnia de 1902 (32 L.P.R.A. sec. 3141 *et seq*).

— O —

Opinión disidente del Juez Asociado Señor Alonso Alonso.

Por vez primera este Tribunal se expresa sobre un asunto de tan trascendental importancia para la sociedad puertorriqueña como lo es la responsabilidad de la prensa por publicaciones que pueden degradar la memoria de un muerto y desacreditar la honra y dignidad de sus familiares sobrevivientes, y lo hace con un razonamiento equivocado.

La opinión mayoritaria de este Tribunal, al descansar *exclusivamente* en la Ley de Libelo y Calumnia de 1902 (32 L.P.R.A. sec. 3141 *et seq.*) y exigir que los demandantes tenían que probar el elemento de *intención o con negligencia crasa y grave menosprecio a la verdad* (véase opinión mayoritaria, pág. 879), para todos los efectos prácticos deja

huérfanos de una causa de acción de daños y perjuicios al padre y a los hermanos de una persona fallecida que sostienen que el titular y la noticia publicados *falsa y negligentemente* por el periódico en cuestión les ha causado *daños a los demandantes*. Además, los priva de su causa de acción sin permitirle siquiera intentar probarla, al decidir este caso declarando con lugar una sentencia sumaria.

## I

De entrada hay que destacar que este caso trata de un padre de familia y unos hermanos *que son ciudadanos comunes o figuras privadas*. No se trata de un funcionario o figura pública donde es necesario establecer malicia real por parte del que publica la información libelosa; *Oliveras v. Paniagua Diez*, 115 D.P.R. 257 (1984). Hemos resuelto que "el asesinato de una persona no convierte a ésta, ni a sus familiares, en figuras públicas." *Colón v. Romero Barceló*, 112 D.P.R. 573, 582 (1982). Por ser ello así, una vez establecida la falsedad de la información y la realidad del daño, basta que el afectado establezca la *negligencia* del autor del escrito o manifestación, según elaborada en el campo del derecho de daños y perjuicios, para que prospere la acción. *González Martínez v. López*, 118 D.P.R. 190, 192 (1987); *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 424 (1977); *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37 (1988).

Equivocadamente, este Tribunal aplica al caso de autos normas jurisprudenciales que fueron elaboradas para casos de acciones de libelo y calumnias incoadas por funcionarios o figuras públicas. *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 180 (1978); *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 690 (1984); *Oliveras v. Paniagua Diez*, supra; *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1985); *Pueblo v. Olivero Rodríguez*, 112 D.P.R. 369 (1982); *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432 (1977). El efecto

del dictamen del Tribunal en el caso de autos es darles a estos ciudadanos privados el mismo trato que a las figuras o funcionarios públicos.

## II

Coincido con el Juez Asociado Señor Fuster Berlingeri en que, en este caso, no procedía dictar sentencia sumaria. Nuestras decisiones que dan trato preferencial a la solicitud de sentencia sumaria se limitan a aquellos casos *en que por tratarse de figuras públicas* es necesario demostrar malicia real. *García Cruz v. El Mundo, Inc.*, supra; *Oliveras v. Paniagua Diez*, supra; *Clavell v. El Vocero de P.R.*, supra.

Por otro lado, los tribunales no están obligados a dictar sentencia sumaria a favor del promovente por el mero hecho de que el promovido no se opusiera a la solicitud de sentencia sumaria. Regla 36.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III. El tribunal puede dictar sentencia sumaria, aun a favor del promovido, si de los autos surge que no existe controversia de hechos esenciales. *M.J.C.A., menor v. J.L.E.M., menor*, 124 D.P.R. 910 (1989). Hemos sostenido que la decisión del foro de instancia sobre el particular merece gran deferencia. Por otra parte, los casos *de daños y perjuicios no deben de ordinario adjudicarse mediante sentencia sumaria*, sino resolverse en el juicio en su fondo. *Vda. de Viera v. Tribunal Superior*, 93 D.P.R. 503, 508 (1966).

Más aún, un examen del expediente del caso refleja que *El Vocero de Puerto Rico, Inc.* (en adelante El Vocero), en su solicitud de sentencia sumaria, *aceptó a los fines de ésta que lo publicado era "totalmente falso"*. Apéndice, pág. 00024. A tales efectos, los demandantes *presentaron un escrito de oposición a sentencia sumaria y solicitud de sentencia sumaria parcial* acogiendo los hechos tal y como *fueron aceptados* por El Vocero en cuanto a la falsedad de lo

publicado. De esta manera, alegaron que no existía "controversia real de hechos en cuanto a la *negligencia* de la parte demandante [sic] al publicar una falsedad difamatoria" ((énfasis suplido) Apéndice, pág. 00016); negaron que fueran de aplicación exclusiva a los hechos las disposiciones de la Ley de Libelo y Calumnia de 1902, y fundamentaron su derecho a ser resarcidos al amparo de las disposiciones del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, y del Art. II, Sec. 8 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

El 14 de octubre de 1988 el tribunal a quo (Hon. Antonio R. Barceló) declaró no ha lugar a ambas solicitudes de sentencia sumaria por entender que existía una controversia real de hechos.

El Vocero presentó ante nos una solicitud de revisión el 10 de enero de 1992. *En esta solicitud de revisión por primera vez alega que al aceptar la falsedad de la información publicada, implícitamente también aceptó que medió negligencia en la publicación y que la parte demandante así lo entendió.* Solicitud de *certiorari*, pág. 4. Por tal razón señala que erró el tribunal de instancia al resolver que existía una controversia real sobre los hechos y, además, que erró al no resolver que como cuestión de derecho procedía dictarse sentencia a su favor.

En estas circunstancias, donde *El Vocero aceptó que lo publicado era "totalmente falso" y en su escrito de revisión ante nos aceptó que medió negligencia en la* publicación, no puede dictarse sentencia sumaria en su favor.

La opinión mayoritaria de este Tribunal evade esta controversia al no aplicar la norma de negligencia procedente bajo los preceptos del Art. 1802 del Código Civil, *supra*, y al confinar el derecho a reclamar de los demandantes exclusivamente a las disposiciones de la Ley de Libelo y Calumnia de 1902.

## III

Nuestra Constitución es diáfana al establecer que la dignidad del ser humano es inviolable y que toda persona tiene derecho a la protección de ley *contra ataques abusivos a su honra, reputación y a su vida privada y familiar.* Art. II, Secs. 1 y 8, Const. E.L.A., L.P.R.A., Tomo 1. También es clara al prohibir la restricción legal estatal a la libertad de palabra o de prensa. Const. E.L.A., *supra*, Sec. 4.

En el pasado hemos expresado que se requiere hacer un balance entre el interés en una ciudadanía debidamente informada y en fomentar el debate vigoroso sobre cuestiones *de interés público*, de un lado, y la protección del derecho a la intimidad, a la protección contra ataques abusivos a la honra y la inviolabilidad de la dignidad del ser humano, del otro. *Clavell v. El Vocero*, supra, págs. 690–691; (1984); *González Martínez v. López*, supra, pág. 192.

En el caso *de funcionarios o figuras públicas*, al sopesar los derechos tutelados por la Constitución, el balance se inclina a favor de la libertad de expresión y de prensa. Ello no es así cuando se trata de *figuras privadas*. En *Torres Silva v. El Mundo, Inc.*, supra, pág. 422, expresamos:

> El fundamento racional de la dicotomía figura pública-privada consiste en que la figura pública, por lo general, goza de un acceso mayor a los medios de comunicación para refutar la publicación difamatoria y contrarrestar su efecto. Además, se asume que la figura pública se ha expuesto voluntariamente al riesgo de un juicio más riguroso por el público. *Pero tal asunción no se justifica en el caso de las figuras privadas que no se han lanzado a la palestra pública y cuyo interés en la reputación personal no ha sido menguado por ninguna actuación voluntaria de su parte. La reparación del daño en estos casos es más digna de ser atendida y más justificado el interés del estado en proteger su reputación.*[1] (Énfasis suplido.)

---

[1] En dicho caso este Tribunal determinó que: la noticia publicada no era difamatoria de su propia faz y fue debidamente corroborada; el periódico prontamente

Son esas disposiciones constitucionales y el Art. 1802 del Código Civil, *supra*, las fuentes primarias aplicables a la controversia ante nos y no la Ley de Libelo y Calumnia de 1902 utilizada por este Foro. Como bien expresamos en *Clavell v. El Vocero de P.R.*, supra, pág. 690:

> La fuente principal de la protección contra la expresión difamatoria es la Constitución del Estado Libre Asociado de Puerto Rico. La Ley de Libelo y Calumnia, Ley de 19 de febrero de 1902 (32 L.P.R.A. sec. 3141 y ss.), *sobrevive tan solo en cuanto es compatible* con esa Constitución. *Cortés Portalatín* v. *Hau Colón,* 103 D.P.R. 734, 738 (1975); *García Cruz* v. *El Mundo, Inc.,* 108 D.P.R. 174, 180 (1978). (Énfasis suplido.)

En el citado caso este Tribunal consideró al demandante, licenciado Clavell, como *una figura pública,* y por ello le dio más peso al "interés en una ciudadanía debidamente informad[a y] en fomentar el debate vigoroso sobre cuestiones de interés público" *(Clavell v. El Vocero de P.R.,* supra, pág. 691) que el derecho a la intimidad. *Esas no son las circunstancias en el caso ante nos.*

En el balance de intereses el requerir la norma de negligencia en caso como el de autos, no menoscaba la libertad de prensa protegida por nuestra Constitución, por tratarse aquí de unas figuras privadas y, además, no ser un asunto de interés público.

Acertadamente ha expresado el Prof. Raúl Serrano Geyls lo siguiente:

> Basta aquí señalar que al presente la Ley de 1902 [refiriéndose específicamente al Art. 2 de la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3142] *parece haber perdido casi toda su importancia y los casos hoy se resuelven principalmente bajo las doctrinas constitucionales aplicables y el Art. 1802 del Código Civil.* (Énfasis suplido.) R. Serrano Geyls, *Derecho constitucional de*

---

rectificó el error; la información era de un asunto de interés general como es el tráfico de drogas; el riesgo de daños era mínimo, pues Torres Silva no tenía hijos varones, lo que era de conocimiento de sus familiares, vecinos, amigos y de las personas cuyo juicio usualmente preocupa a este Foro, y la información publicada fue la misma que le dio la Policía al periodista.

*Estados Unidos y Puerto Rico*, Colegio de Abogados de Puerto Rico, Instituto de Educación Práctica Inc., 1988, Vol. II, pág. 1348.

Sostengo que en las circunstancias del presente caso, y tratándose de personas que son *figuras privadas*, no cabe aplicar como norma *exclusiva* para la concesión de un remedio el elemento de *intención* que dispone la Sec. 2 de la Ley de Libelo y Calumnia de 1902, *supra*, pues ello conflige con las Secs. 1 y 8 del Art. II de la Constitución del Estado Libre Asociado, *supra*.

La opinión mayoritaria del Tribunal equivocadamente le adiciona en la alternativa al elemento *de intención*, el requisito de que la publicación se haga *"con negligencia crasa y grave menosprecio de la verdad"*. (Énfasis suplido.) Opinión mayoritaria, pág. 881.

Este dictamen plantea problemas adicionales graves. En primer lugar, introduce un elemento que crea más incertidumbre sobre cuál es la norma que ha de aplicarse en estos casos, y, en segundo lugar, para todos los efectos prácticos, equipara la norma de malicia real requerida para los casos de figuras públicas a figuras privadas.

Le asiste a los demandantes el derecho a ser resarcidos bajo la normativa constitucional vigente y al amparo de las disposiciones del Art. 1802 del Código Civil, *supra*, independientemente de las disposiciones de la Ley de Libelo y Calumnia de 1902. *Romany v. El Mundo, Inc.*, 89 D.P.R. 604 (1963). A tales efectos, el demandante lo que tiene que probar es que la información es falsa y que el demandado actuó negligentemente. Véanse: *Oliveras v. Paniagua Diez*, supra, pág. 262; *González Martínez v. López*, supra; *Ocasio v. Alcalde Mun. de Maunabo*, supra; *Colón v. Romero Barceló*, supra.

Como magistralmente expresara el insigne puertorriqueño Eugenio María de Hostos:

No hay ningún *sacerdocio más alto que el del periodista*; pero,

por lo mismo, no hay sacerdocio que imponga más deberes, y por lo mismo, no hay sacerdocio más expuesto a ser peor desempeñado. (Énfasis suplido.) E.M. de Hostos, *Tratado de Moral*, La Habana, Cuba, Cultural, S.A., 1939, pág. 288.

La opinión que hoy emite este Tribunal, al no aplicar la norma de negligencia a la que hemos hecho referencia, limita significativamente las acciones de daños y perjuicios que pueden tener *figuras privadas* contra la prensa. Ello tiene un enorme alcance e impacto, particularmente al debilitar los derechos constitucionales que protegen la dignidad del ser humano, su vida privada y familiar, así como su honra y reputación.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

El asunto ante nuestra consideración se limita estrictamente a indagar si procedía o no una sentencia sumaria en el caso de autos. Con arreglo a los documentos que obran en el expediente, nos toca decidir sencillamente si el tribunal de instancia erró al resolver que no podía concluir, fuera de dudas, que no existía controversia real y sustancial alguna sobre los hechos materiales del caso.

Reiteradamente hemos señalado que la sentencia sumaria debe dictarse solamente *en casos claros*, cuando el tribunal tenga ante sí la verdad sobre todos los hechos pertinentes. *Roth v. Lugo*, 87 D.P.R. 386, 397 (1963); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986); *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272 (1990). Para dictar una sentencia sumaria de desestimación de demanda debe surgir, incontrovertiblemente de la documentación en autos, que la parte demandante no puede prevalecer en ninguna circunstancia que resulte discernible en las alegaciones que no hayan sido refutadas por

la evidencia presentada con la moción. *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, págs. 720–721; *Cuadrado Lugo v. Santiago Rodríguez*, supra.

Quien solicita la sentencia sumaria viene obligado a demostrar que no hay controversia genuina de hecho que deba ser juzgada, y que procede dictar sentencia como cuestión de derecho. *Gaztambide v. Sucn. Ortiz*, 70 D.P.R. 412 (1949); *Cortés Piñeiro v. Sucn. A. Cortés*, 83 D.P.R. 685, 691 (1961); *Valcourt Questell v. Tribunal Superior*, 89 D.P.R. 827, 832 (1964). Para obtener una sentencia sumaria a su favor, la parte tiene que presentar pruebas concretas que lo eximan de su responsabilidad en todos los aspectos pertinentes. *Cuadrado Lugo v. Santiago Rodríguez*, supra.

La parte contra quien se solicita la sentencia sumaria debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente de dicha sentencia. Sin embargo, el solo hecho de no haberse opuesto con evidencia que controvierta la presentada por el promovente *no implica necesariamente* que proceda la sentencia sumaria o que el promovente tenga derecho a que se dicte a su favor. *Flores v. Municipio de Caguas*, 114 D.P.R. 521 (1983); *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 721.

Una vez sometida una moción desestimatoria de sentencia sumaria y su oposición, si el tribunal determina que algún hecho material ha sido controvertido por la parte opositora o que hay alegaciones afirmativas en la demanda que no han sido refutadas, debe denegar la solicitud. *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 722–723. Todos los hechos presentados en los documentos que acompañen la moción de sentencia sumaria deben verse de la forma más favorable para la parte que se opone a la moción, *concediendo a esta parte el beneficio de toda inferencia que razonablemente se pueda derivar de ellos. Howard v. Russell Stover Candies, Inc.*, 649 F.2d 620, 623

(8vo Cir. 1981); *Jorge v. Universidad Interamericana*, 109 D.P.R. 505 (1980); J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1985, Vol. II, Cap. V, pág. 188. Si el tribunal de instancia tiene *alguna duda* sobre la existencia de algún hecho material, *no procede dictar sentencia sumaria. Valcourt Questell v. Tribunal Superior,* supra, pág. 832; *Roth v. Lugo,* supra; *Corp. Presiding Bishop CJC of LDS v. Purcell,* supra, págs. 720–721. Este rigor es necesario para evitar despojar a un litigante de su día en corte. *Roig Com. Bank v. Rosario Cirino,* 126 D.P.R. 613 (1990).

Surge de las alegaciones del caso ante nuestra consideración, que existe una controversia real en cuanto a si el occiso era o no homosexual. Fue, precisamente, la publicación por el periódico de la imputación de homosexualidad del occiso lo que produjo las grandes angustias y sufrimientos mentales que los demandantes alegan haber padecido. Más aún, de las alegaciones también surge que los demandantes aseveran que esa imputación fue totalmente infundada; que no surgía del expediente policial, como alega a su vez el periódico. Resulta, pues, que hay controversias sobre hechos materiales del caso.

Frente a tales controversias no es suficiente la alegación del demandado de que no tuvo la *intención* de desacreditar la memoria del occiso o causar daño a los demandantes. Presumiendo que para que los demandantes tengan éxito en su reclamación tienen que establecer que la acción del periódico fue *intencional*,[1] tal elemento de la causa de ac-

---

[1] A los fines del análisis, estamos presumiendo que el elemento de *intención* en la Sec. 2 de la Ley de Libelo y Calumnia de 19 de febrero de 1902 (32 L.P.R.A. sec. 3142) es válido. No obstante, debe anticiparse la posibilidad de que tal elemento no sea aceptable ya, a la luz de las disposiciones de las Secs. 1 y 8 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Según hemos reiterado en varias ocasiones, la fuente principal de la protección contra expresiones difamatorias o libelosas es, en primer término, la Constitución. La vigencia de la Ley de Libelo y Calumnia está *condicionada a que su aplicación no sea incompatible con las disposiciones constitucionales. Cortés Portalatín v. Hau Colón,* 103 D.P.R 734, 738 (1975); *García Cruz v. El Mundo, Inc.,* 108 D.P.R. 174 (1978); *Clavell v. El Vocero de P. R.,*

ción puede probarse *circunstancialmente*. Es decir, en una acción civil como ésta, el elemento de intención puede *inferirse* de los otros hechos del caso. Ciertamente, si tales son los hechos, un tribunal podría inferir que la actuación de un periódico fue intencional si éste, con fines sensacionalistas, publica como cierta una grave imputación que luego resulta ser falsa, en casos que tratan de personas que no son figuras públicas.

La Regla 10(H) de Evidencia de 1979 (32 L.P.R.A. Ap. IV) permite. probar *cualquier* hecho en controversia mediante evidencia indirecta o circunstancial;[2] y aun en el procesamiento criminal, mucho más riguroso que el del caso ante nos en lo que a prueba se refiere, el elemento de *intención* puede ser establecido por inferencias.[3] Y este Tribunal en innumerables ocasiones ha reiterado que el elemento de la intención puede ser inferido. *Pueblo v. De León*, 102 D.P.R. 446 (1974); *Pueblo v. Torres Montañez*, 106 D.P.R. 125 (1977); *Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979); *Pueblo v. Castañón Pérez*, 114 D.P.R. 532 (1983); *Pueblo v. De Jesús Colón*, 119 D.P.R. 482 (1987);

---

115 D.P.R. 685 (1984); *Villanueva v. Hernández Class*, 128 D.P.R. 618 (1991).

Véase, además, la opinión disidente del Juez Asociado Señor Alonso Alonso en este mismo caso.

[2] "*Regla 10. Evaluación y suficiencia de la prueba.* El tribunal o juzgador de hechos deberá evaluar la evidencia presentada, a los fines de determinar cúales hechos han quedado establecidos o demostrado[s] con sujeción a los siguientes principios:

"(H) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Se entiende por evidencia directa aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna, y que de ser cierta demuestra el hecho de modo concluyente. Se entiende por evidencia indirecta o circunstancial aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual —en unión a otros hechos ya establecidos— puede razonablemente inferirse el hecho en controversia."

[3] El Código Penal vigente, en su Art. 14, dispone:

"Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal.

"La intención o la negligencia se manifiestan por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona. —Código Penal, 1974, art. 14." 33 L.P.R.A. sec. 3061.

*Pueblo v. Narváez Narváez*, 112 D.P.R. 80 (1988). Además de ello se ha señalado, como principio básico, que el ordenamiento jurídico supone que toda persona intenta las consecuencias naturales de sus actos. *Pueblo v. De León*, supra, pág. 449.

Dicho de otra forma, en una sociedad como la nuestra, donde es generalmente conocido que la imputación sensacionalista y falsa de que un hijo es o fue homosexual, indudablemente, puede causar consternación grave a los padres de esa persona, la publicación deliberada y consciente de tal imputación con menosprecio a la veracidad de lo imputado, puede dar fundamento a una *inferencia de jure* de intencionalidad, por lo menos en casos donde no hay figuras públicas. Ello es particularmente cierto si se toma en cuenta no sólo nuestra realidad cultural sobre el grave estigma que representa la homosexualidad sino, además, el valor preeminente que en nuestra Constitución tienen el derecho a la intimidad y la protección contra ataques abusivos a la honra y a la reputación.

Cuando la prensa trata con personas privadas respecto a las cuales no les cobijan las inmunidades especiales que surgen de la libertad de expresión, debe actuar con arreglo a criterios ordinarios de responsabilidad, particularmente en casos como el de autos que tratan sensibilidades muy especiales y notoriamente arraigadas en nuestra realidad cultural. Ello es singularmente cierto si la expresión en cuestión no es parte esencial o importante de la noticia que se quiere divulgar y si su publicación responde principalmente al cálculo de que así se satisfacen los intereses morbosos o voluptuosos del público que lee el periódico.

En el caso de autos se presentó el siguiente título con mucho relieve:

"Matan homosexual en motel"

La imputación de homosexualidad es sin dudas el elemento polarizador de la atención del lector. Esta realidad,

de por sí, hubièse sido suficiente para crear en el juzgador alguna duda sobre si hubo o no intención, de resultar falso el hecho controvertido de la homosexualidad. El juez pudo haber concluido que la imputación de homosexualidad, como se hizo aquí, fue hecha *intencionalmente*, y por lo tanto, si hay disputa sobre la homosexualidad, también la hay *ipso jure* sobre el elemento de intención. De cualquier forma, este Tribunal ya ha señalado antes que el mecanismo procesal de sentencia sumaria *no debe utilizarse*, en casos como el de autos, *cuando la existencia de un estado mental como la intención es parte de la controversia.* Si hay elementos subjetivos implicados cuya prueba siempre es difícil, y cuando para llegar a la verdad se depende en gran parte de lo que se extraiga del curso de un juicio vivo, no procede la sentencia sumaria. *García López v. Méndez García*, 88 D.P.R. 363 (1963); *Cuadrado Lugo v. Santiago Rodríguez*, supra.

Ausentes los beneficios de la sociedad que se protegen mediante la libertad de expresión, la prensa como empresa no tiene privilegios que le den una posición especial en los trámites judiciales.[4] Por el mero hecho de ser un periódico no tiene derecho a un dictamen favorable sobre sentencia sumaria, si hay hechos materiales en controversia como los hay en este caso, y si están involucradas partes privadas, como es aquí. El tribunal a quo correctamente determinó que no procedía la sentencia sumaria.

---

[4] *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).