# 2006 DTA 87

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL III**

IVÁN J. BORGES AGUAYO; DAVID M. MÉNDEZ LÓPEZ
Apelantes

v.

CELULARES TELEFÓNICA INC., HOY VERIZON WIRELESS; EZEQUIEL NIEVES; *ET AL.*
Apelados

Núm. KLAN-2005-00406

San Juan, Puerto Rico, a 16 de junio de 2006

Panel integrado por su Presidenta, la Juez Bajandas Vélez,
y los Jueces Aponte Hernández y Vivoni del Valle

Vivoni del Valle, Juez Ponente

■

## TEXTO COMPLETO DE LA SENTENCIA

Comparecen ante nos los señores Iván J. Borges Aguayo y David M. Méndez López (en conjunto, los apelantes) y nos solicitan que revoquemos la Sentencia Sumaria Parcial emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante TPI) el 20 de octubre de 2004 y notificada el 5 de enero de 2005. Mediante la misma, el TPI declaró con lugar una moción de sentencia sumaria presentada por Celulares Telefónica, Inc. (Celulares Telefónica o la apelada) ■ y desestimó las reclamaciones de los apelantes al amparo de la Ley 75 de 24 de junio 24 de 1964, conocida como la Ley de Contratos de Distribución 10 L.P.R. A. sec. 278 *et seq.* El TPI concluyó que los apelantes no podían ser considerados como distribuidores al tenor de la mencionada ley.

Examinados los escritos de las partes, los documentos que obran en autos y el derecho aplicable, resolvemos confirmar la sentencia parcial apelada.

### I

El 9 de octubre de 2001, los ahora apelantes presentaron una demanda sobre sentencia declaratoria, incumplimiento de contrato y daños contra Celulares Telefónica. En esencia, en dicha demanda alegaron que Celulares Telefónicas les había otorgado sendos contratos para la distribución de servicio radio celular. Señalaron que la distribución se llevaba a cabo mediante la promoción y conclusión de contratos de ventas de servicio y equipo celular. Además, indicaron que ellos conquistaron una clientela y crearon un mercado para Celulares Telefónica. Arguyeron que la aquí apelada menoscabó sus beneficios económicos al modificar, de forma arbitraria y unilateral, el itinerario de sus comisiones. Alegaron también en la demanda que Celulares Telefónica procedió a cancelar los contratos sin justa causa con el propósito de establecer sus propios centros de venta y distribución.

Por su parte, el 2 de enero de 2002, la apelada contestó la demanda y negó las alegaciones de los apelantes. Adujo que los aquí apelantes no eran distribuidores conforme a la definición de la Ley de Contratos de Distribución, *supra.*

Luego de varios trámites procesales relacionados con el descubrimiento de prueba, el 13 de abril de 2003, Celulares Telefónica presentó una moción de sentencia sumaria, a la cual anejó copia del contrato de distribución y de las transcripciones de las deposiciones tomadas a los ahora apelantes. En síntesis, dicha moción señalaba que no existía controversia en cuanto a que los apelantes no tenían derecho a los remedios provistos por la Ley de Contratos de Distribución, *supra.* Celulares Telefónica alegó que los aquí apelantes no tenían independencia empresarial, ya que no asumían riesgo alguno. Además señaló que poseer un inventario de teléfonos celulares no era razón suficiente para catalogar a los apelantes como distribuidores. Asimismo, aseveró que la función de los apelantes se limitaba a tramitar órdenes de servicio.

Así las cosas, el 6 de julio de 2004, los aquí apelantes presentaron su oposición a la moción de sentencia sumaria. En esencia, esgrimieron que existían hechos materiales en controversia por lo que no procedía dicha moción y era necesario la celebración de una vista en su fondo. Además, indicaron que el contrato hacía referencia a ellos como distribuidores. Añadieron que ellos: (1) llevaban a cabo una activa promoción y/o conclusión de contratos para Celulares Telefónica; (2) adquirían inventario para poder concluir los referidos contratos; (3) ejercían control sobre los precios; (4) tenían discreción para pactar los términos de venta y para conceder crédito; (5) llevaban a cabo gestiones independientes y conjuntas de publicidad; (6) compraban los teléfonos celulares necesarios para distribuir el servicio de telefonía celular; y (7) contaban con facilidades físicas para la distribución de dicho servicio a los clientes.

Celulares Telefónica replicó el 10 de agosto de 2004. Adujo que la mera aparición de la palabra *"distribuidor"* en el contrato no convertía a los apelantes en distribuidores al tenor de la Ley de Contratos de Distribución, *supra*, ya que *"el nombre no hace la cosa"*. Asimismo, sostuvo que los ahora apelantes no tenían independencia empresarial. Fundamentó su argumento en que durante la deposición los ahora apelantes habían aceptado que no podían variar los términos de los servicios ofrecidos ni las tarifas cobradas. Celulares Telefónica argumentó además, que los ahora apelantes admitieron que no podían otorgar contratos de servicio radio celular a personas que no fueran aprobadas previamente por la aquí apelada.

Por otro lado, indicó la aquí apelada que el contrato entre ella y los ahora apelantes trataba exclusivamente sobre la venta de servicio radio celular y no de equipos telefónicos. De ahí, que el hecho de que los ahora apelantes pudieran fijar los precios de los teléfonos que vendían no se traducía a que podían modificar los términos de los contratos de servicios de radio celular. Celulares Telefónica alegó que era irrelevante si los apelantes invirtieron en la compra de teléfonos celulares y que ejercieran control sobre su precio, debido a que *"lo medular en el caso de venta de servicios es la autoridad que tenga el vendedor para variar los términos del servicio ofrecido y el control que ejerza sobre el negocio"*. Además, adujo que el único riesgo que corrían los ahora apelantes en el ejercicio de sus funciones era la pérdida de sus comisiones. Señaló que tanto el Tribunal Federal como nuestro Tribunal Supremo han resuelto que los comisionistas no están protegidos por la Ley de Contratos de Distribución, pues el riesgo que asumen es mínimo. Por último, Celulares Telefónica puntualizó que las gestiones de publicidad y promoción de sus servicios, promovidas por los ahora apelantes, no eran suficientes para convertirlos en distribuidores.

El 30 de agosto de 2004, los ahora apelantes presentaron en el TPI una dúplica en la que refutaron las alegaciones esbozadas por Celulares Telefónica en su réplica. Además de reiterar los argumentos levantados en su oposición a la sentencia sumaria, subrayaron que *"sin teléfono celular, no hay servicio radio celular"*.

El 20 de octubre de 2004, notificada el 5 de enero de 2005, el TPI dictó sentencia sumaria parcial mediante la cual desestimó las reclamaciones de los ahora apelantes al amparo de la Ley de Contratos de Distribución, *supra*. En resumen, el TPI determinó que los ahora apelantes no eran distribuidores al tenor de dicha ley y su jurisprudencia interpretativa, y por tanto, no tenían derecho a un remedio bajo la misma.

Así las cosas, el 20 de enero de 2005, los ahora apelantes solicitaron la reconsideración del aludido dictamen, la cual fue acogida por el TPI el 25 de enero subsiguiente. Posteriormente, el 8 de marzo de 2005, el TPI notificó su denegatoria a reconsiderar dicha sentencia.

Insatisfechos, el 7 de abril de 2005, los apelantes acuden oportunamente ante nos y señalan como error por parte del TPI:

*"El Honorable Tribunal de Instancia erró al dictar sentencia sumaria parcial porque existe controversia sustancial sobre hechos materiales de este caso."*

En esencia, catalogaron la cancelación de sus contratos como *"parte de un esquema para desplazar a los Distribuidores de CTI [la apelada] luego de la creación del mercado y la conquista de la clientela"*. Asimismo, éstos reafirmaron que: (1) tenían autoridad para fijar precios, ofertas y descuentos en el servicio radio celular; (2) promovían y concluian contratos; (3) podían conceder crédito a los suscriptores con respecto al equipo de teléfono, ello para promover la distribución del servicio radio celular; (4) gestionaban la publicidad del servicio; y (5) asumían riesgos en la operación de su negocio tales como la inversión en equipos celulares, y el recobro de su comisión cuando los clientes cancelaban su contrato antes de transcurridos 150 días desde su otorgamiento.

Por su parte, el 10 de junio de 2005, Celulares Telefónica presentó su oposición al recurso. Señalan, en

resumen, que la venta de teléfonos celulares como un instrumento para la distribución del servicio de radio celular no era suficiente para catalogar a los apelantes como distribuidores. Arguyen que los apelantes no tenían la autoridad para variar los términos del servicio ofrecido y tampoco ejercían un grado de control sobre el negocio. Agrega la apelada que el único riesgo que corrían los apelantes era la pérdida de sus comisiones, y que la jurisprudencia ha sido enfática en que los comisionistas no están protegidos por la Ley de Contratos de Distribución, *supra*.

Con el beneficio de las comparecencias de ambas partes, procedemos a resolver.

## II

Es norma reiterada que la moción de sentencia sumaria regulada por la Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36, permite al tribunal disponer de un caso sin celebrar vista en su fondo en aquellas situaciones en que la parte que la solicita demuestra que no existe controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. *PFZ Properties, Inc. v. General Accident Insurance Company*, 136 D.P.R. 881 (1994); *Medina Morales v. Merck Sharp & Dohme*, 135 D.P.R. 716 (1994).

El propósito de la sentencia sumaria es aligerar la tramitación de los casos en forma justa, rápida y económica, permitiendo que se dicte sentencia cuando de los documentos surge que no existe disputa sobre un hecho esencial y sólo resta aplicar el derecho, por lo que resulta innecesario celebrar un juicio en su fondo. *Rosario v. Nationwide Mutual*, Opinión del 4 de marzo de 2003, 158 D.P.R. ___ (2003), **2003 J.T.S. 34**.

En este contexto, el tribunal debe analizar si existen o no controversias en cuanto a los hechos y que en derecho procede emitir sentencia a favor de la parte que la solicita. No cabe duda que un tribunal debe dictar sentencia sumaria a favor de la parte promovente si de los autos y de los documentos presentados en apoyo y oposición de dicha moción surge que no existe controversia alguna en cuanto a los hechos esenciales y que, como cuestión de derecho, procede que se dicte la misma a favor de la aludida parte. Sin embargo, como dicha determinación requiere la adjudicación de un litigio sin que las partes tengan la oportunidad de presentar su caso ante el tribunal, la jurisprudencia ha concebido la sentencia sumaria como un remedio extraordinario que sólo debe concederse cuando el promovente ha establecido su derecho con claridad. *Benítez et als.* v. *J&J*, Opinión del 30 de septiembre de 2002, 158 D.P.R. ___ (2002), **2002 J.T.S. 137**, *García* v. *Darex P.R. Inc.*, 148 D.P.R. 364 (1999). Además, se puede conceder cuando el promovente ha tenido una oportunidad adecuada de demostrar que el oponente no tiene derecho a que se dicte sentencia en su favor como cuestión de derecho. *González Pérez v. E.L.A.*, *supra*; *M.J.C.A. menor v. Julio E. menor*, 124 D.P.R. 910 (1989).

De otro lado, sabido es también que le corresponde a la parte promovida rebatir dicha moción por vía de declaraciones juradas u otra documentación que apoye su posición, pues si bien el no hacerlo necesariamente no significa que ha de emitirse el dictamen sumario automáticamente en su contra, tal omisión lo pone en riesgo de que ello ocurra. *Corp. Presiding Bishop CJC of LDS* v. *Purcell*, 117 D.P.R. 714 (1987). Claro está, toda duda sobre si un hecho fue controvertido debe resolverse a favor de la parte que se opone a la moción porque en esta etapa del procedimiento el juez no debe considerar la credibilidad de los documentos.

La Regla 36.3 de las de Procedimiento Civil impone también al juez que atiende una solicitud de sentencia sumaria la obligación de considerar no sólo las declaraciones juradas sometidas para sustentarlas o las contra declaraciones juradas de la parte contraria, sino también "*las alegaciones, [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas*" amén de "*todo documento admisible en evidencia*" que obre en autos. *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 D.P.R. 599, 610 (2000).

Al tenor de esta obligación, el juzgador deberá analizar concienzudamente la moción de sentencia sumaria y su oposición, con sus respectivos anejos y el expediente en su totalidad, con el propósito de determinar si queda

algún hecho material en controversia o si existen alegaciones afirmativas en la demanda que no han sido refutadas. En cualquiera de dichos casos, de ello ser así, el tribunal deberá denegar la solicitud de sentencia sumaria. *Corp. Presiding Bishop CJC of LDS v. Purcell, supra*. Sabido es también que una vez el tribunal tiene ante sí todos los documentos, debe analizar los hechos en la forma más favorable a la parte que se opone a que se dicte sentencia sumaria. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992). La existencia de duda por parte del tribunal sobre la existencia o no de una controversia de hechos en el caso bajo su consideración, derrota la moción de sentencia sumaria. *Corp. Presiding Bishop CJC of LDS v. Purcell, supra*. Así, nuestro más Alto Foro ha resuelto que, "*sólo procede dictar sentencia sumaria cuando surge claramente que el promovido por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuent[a] con la verdad de todos los hechos necesarios para poder resolver la controversia. Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria*". *Mgmt. Adm. Servs. Corp. v. E.L.A., supra*, pág. 440.

Sabido es también que "*hay litigios y controversias que por la naturaleza de los mismos no hacen deseable o aconsejable el resolverlos mediante una sentencia sumariamente, porque difícilmente en tales casos, el Tribunal puede reunir ante sí todas la verdad de los hechos a través de 'affidávits' o deposiciones. Rosario v. Nationwide Mutual, supra.*"

### III

Por otro lado, debemos señalar que la Ley de Contratos de Distribución, *supra*, tiene el propósito de proteger los derechos legítimos de los distribuidores frente a los abusos de los suplidores o principales que, sin justa causa, dan por terminadas o menoscaban sus relaciones contractuales con éstos tan pronto han creado un mercado favorable para sus productos. *P.R. Oil Co., Inc. v. Dayco Prod., Inc.*, Opinión del 6 de abril de 2005, 164 D.P.R. ____ (2005), **2005 J.T.S. 47**. La referida Ley aplica tanto a los distribuidores de mercancías como a los que prestan un servicio. *Lorenzana v. Gen. Accid. Ins. Co.*, 154 D.P.R. 547 (2001); *Córdova & Simonpietri v. Crown American*, 112 D.P.R. 797, 803 (1982).

Para proteger a estos intermediarios que han actuado en beneficio de sus principales, la Ley establece a su favor una causa de acción por daños y perjuicios por la terminación o menoscabo del contrato de distribución, cuando esto ocurre sin justa causa. 10 L.P.R.A. sec. 278(a); *B.W.A.C. Int'l v. Quasar Co.*, 138 D.P.R. 60, 68 (1995). Al respecto, el Art. 2 de esta ley aclara que:

"*No empece la existencia en un contrato de distribución de una cláusula reservándole[s] a las partes el derecho unilateral a poner fin a la relación existente, ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación establecida, o negarse a renovar dicho contrato a su vencimiento normal, excepto por justa causa.*" 10 L.P.R.A. sec. 278 (a).

Ahora bien, la Ley 75 define el término "*distribuidor*" como "*aquella*" *persona realmente interesada en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la distribución, agencia, concesión o representación de determinada mercancía o servicio.*" 10 L.P.R.A. sec. 278. De igual modo, el "*contrato de distribución*" aparece definido en la misma como la "*relación establecida entre un distribuidor y un principal o concedente, mediante la cual, e irrespectivamente de la forma en que las partes denominen, caractericen o formalicen dicha relación, el primero se hace real y efectivamente cargo de la distribución de una mercancía, o de la prestación de un servicio mediante concesión o franquicia, en el mercado de Puerto Rico.*" *Id.*

Nuestro Tribunal Supremo de Puerto Rico ha expresado que estas definiciones son bastante esquemáticas y poco precisas, razón por la cual, los tribunales han tenido que delimitar su contenido conforme a los fines que persigue el estatuto. *Lorenzana v. Gen. Accid. Ins. Co., supra*; *Roberco, Inc. y Colón v. Oxford Inds.*, Inc., 122 D.P.R. 115, 124 (1988).

Nuestro más Alto Foro ha aclarado, en este sentido, que la figura del distribuidor se identifica fundamentalmente por su gestión de crear un mercado favorable y conquistar una clientela para un producto o servicio mediante la promoción y conclusión de contratos de venta de los productos del principal. *Jarra Const. v. Axxis Corp.*, 155 D.P.R. 764 (2001); *Lorenzana v. Gen. Accid. Ins. Co., supra.*

La función del distribuidor comprende, de ordinario, las actividades necesarias para la transferencia del fabricante al consumidor, o a algún punto intermedio de la mercancía o servicio. En términos generales, se consideran obligaciones del distribuidor la publicidad del producto, la coordinación del mercado, las entregas de mercancía, los cobros, el mantenimiento de inventario y la promoción y conclusión de contratos de ventas. *San Juan Merc. v. Canadian Transport Co.,* 108 D.P.R. 211, 215 (1978); *J. Soler Motors v. Kaiser Jeep Int'l,* 108 D.P.R. 134, 142 (1978). Un contrato de distribución también se caracteriza por su continuidad, estabilidad, confianza mutua y coordinación entre ambas partes en calidad de empresarios independientes, sin subordinación jerárquica. *J. Soler Motors v. Kaiser Jeep Int'l, supra.*

En este tipo de contrato *"cada empresario explota su propia empresa en su nombre, asume sus propios riesgos y busca su propio lucro"*. *Medina & Medina v. Country Pride Foods,* 122 D.P.R. 172, 187 (1988). Generalmente, la relación acarrea una inversión económica por parte del distribuidor, quien asume los riesgos iniciales para el desarrollo del mercado. *Roberco, Inc. y Colón v. Oxford Inds., Inc., supra.*

Nuestro Tribunal Supremo de Puerto Rico ha señalado también que para determinar si una parte es acreedora a la protección brindada por la Ley 75 se deben considerar, sin exclusión de otros, los siguientes factores: 1) si el distribuidor realiza una actividad promoción y/o conclusión de contratos; 2) si adquiere inventario; (3) si ejerce control sobre los precios; 4) si tiene discreción en cuanto a pactar los términos de las ventas; 5) si tiene responsabilidad por la entrega y el cobro de la mercancía y autoridad para conceder crédito; 6) si lleva a cabo gestiones independientes o conjuntas de publicidad; 7) si ha asumido el riesgo y la responsabilidad en la gestión que realiza; 8) si compra el producto; 9) si tiene facilidades físicas y ofrece servicios relacionados con el producto a sus clientes. *Cobos Liccia v. DeJean Packing Co., Inc.,* 124 D.P.R. 896, 907 (1989); *Roberco, Inc. y Colón v. Oxford Inds., Inc., supra.*

Claro está, ninguno de estos criterios es determinante por sí sólo, ni tiene mayor peso o importancia. De igual manera, tampoco se trata de un listado exhaustivo. *Oliveras, Inc. v. Universal Ins. Co.,* 141 D.P.R. 900, 915 (1996); *Cobos Liccia v. DeJean Packing Co., Inc., supra.* Así, pues, los tribunales tienen el deber de examinar y ponderar, en cada caso, las circunstancias existentes para determinar si una relación está cubierta por la Ley. *Cobos Liccia v. DeJean Packing Co., Inc., supra; Roberco, Inc. y Colón v. Oxford Inds., Inc., supra.*

## IV

Con el marco jurídico antes esbozado, pasemos a evaluar si, al tenor de los documentos desfilados ante el TPI, procedía la concesión de la sentencia sumaria en contra de los apelantes.

En primer término, hay que analizar si el contrato de los apelantes era uno de servicios, productos o una combinación entre ambos.

Los apelantes postulan que para distribuir el *servicio* radio celular de la apelada era necesario proveer un teléfono celular y una línea de servicio para el mismo. Además, los apelantes sostienen que tuvieron que adquirir y mantener, a su costo, un inventario de teléfonos. Expresan que en cada *Solicitud de Servicio Celular* se desglosaba, entre otros, la marca y modelo del teléfono vendido y los accesorios provistos al cliente. En otras palabras, que la venta del servicio estaba inexorablemente atada a la venta de los teléfonos. En cambio, Celulares Telefónica señala que la inclusión del equipo de teléfono celular no tenía que ver con la verdadera relación entre las partes, la que según ésta, se circunscribía a la venta del *servicio* radio celular.

En observancia a los términos pactados, las partes estaban sujetas a un contrato de servicios. El producto al que se refieren los apelantes, es decir, el equipo telefónico, realmente no estuvo contemplado en ninguna de las instancias del convenio. Por el contrario, el Artículo 8 del mencionado contrato se desliga completamente del manejo de los equipos celulares cuando establece que *"el CTI no será responsible (sic) por la instalación, calidad de transmisión o mantenimiento de la unidad móvil..."*. ■ Es decir, Celulares Telefónica estaba ajena a los términos y condiciones mediante los cuales los apelantes adquirían y vendían los equipos telefónicos. El pacto entre las partes se circunscribía específicamente a *"conseguir suscriptores"* para el servicio de radio celular y *"referir"* a éstos a Celulares Telefónica. ■ Por lo anteriormente esbozado, no encontramos fundamento alguno que apoye el argumento de los apelantes y concluimos que el acuerdo que regía entre las partes era para el mercado de servicios.

Por otro lado, como anteriormente mencionáramos, en la relación contractual, la función principal de los apelantes era conseguir suscriptores para el servicio radio celular y referirlos a Celulares Telefónica. ■ A cambio de tales servicios, los apelantes recibían una comisión por cada nuevo cliente, ■ calculada a base de una tabla de compensación elaborada por la Celulares Telefónica. ■ El apelante recibiría la referida comisión si el suscriptor permanecía en el servicio al menos *"150 días calendario consecutivos desde la fecha de su activación."* ■ Asimismo, el Artículo 9 del Contrato de Distribuidor dispone que la aceptación de un suscriptor potencial y el pago de la comisión a los apelantes dependería de los siguientes factores: (1) que el distribuidor completara apropiadamente todos los documentos requeridos por la apelada; (2) la aprobación de Celulares Telefónica del análisis de crédito del cliente, y (3) el recibo y aprobación de cualquier depósito o efectivo por adelantado requerido por ésta. ■ Entre los documentos requeridos, los apelantes tenían que utilizar unas órdenes de servicio provistas por la Celulares Telefónica, a ser firmadas por los *"suscriptores"*. ■

Los apelantes sostienen en su recurso de apelación que ellos tenían la facultad de concluir contratos. En apoyo de su contención, traen ante nuestra atención varios formularios titulados *"Solicitud de Servicio Celular"*, los cuales fueron firmados por éstos. Conviene indicar, que dichos documentos son los formularios preimpresos provistos por Celulares Telefónica que, al ser firmados por los suscriptores, se convertían en el contrato de servicio entre éstos y Celulares Telefónica. Así pues, en el encasillado titulado *"Certificación"*, localizado en la parte inferior izquierda del anverso del documento, se dispone lo siguiente: Nota al Cliente – Al firmar este documento, usted certifica que ha recibido copia de esta solicitud, que la ha leído, la entiende y está de acuerdo con los términos de este contrato incluidos en el lado opuesto de este documento. ■

Al reverso de la *"Solicitud de Servicio Celular"*, se encuentra un encabezado que lee *"Contrato de Servicio Celular"*. En la primera oración, éste dispone que *"la PUERTO RICO TELEPHONE COMPANY (PRTC) y el firmante al dorso de este contrato ("el Cliente") acuerdan los siguientes términos y condiciones..."*. ■

Como claramente puede observarse, en el momento en que el suscriptor firmaba el contrato, se entiende que había brindado su consentimiento a la oferta hecha por Celulares Telefónica, y por tanto, se había perfeccionado el contrato entre ambos. Debemos recordar que los elementos esenciales para la validez de los contratos son el consentimiento, el objeto y la causa. ■ Además, para que el contrato se entienda perfeccionado, el destinatario de la oferta tiene que brindar su consentimiento y aceptarla sin cambiar su contenido. En este caso, resolvemos que la firma de los apelantes no podía tener el efecto de concluir los contratos de servicio radio celular entre los clientes y Celulares Telefónica. Ciertamente, los mencionados contratos quedaron perfeccionados cuando los suscriptores expresaron su consentimiento por medio de su firma, y no cuando los apelantes plasmaban la suya.

Por otro lado, los apelantes no están de acuerdo con la determinación de que Celulares Telefónica era la que tenía derecho a rechazar al suscriptor que no cumpliera con las normas de crédito aplicables. Además, sostienen que ellos estaban facultados para rechazar a un suscriptor aun cuando éste tuviera un historial de crédito excelente. Asimismo, esbozan que ellos podían conceder al suscriptor un descuento adicional o total al precio

de venta del teléfono celular como un atractivo.

Los argumentos de los apelantes no nos convencen. Ciertamente es inmaterial si los apelantes podían decidir a quién vender, una vez Celulares Telefónica autorizaba el contrato. A tales efectos, el Artículo 4 del contrato entre las partes establece que "*Sujeto a las leyes y reglamentos aplicables, CTI tiene derecho a rechazar a cualquier suscriptor si éste no cumple con las normas de crédito aplicables*" y se "*cumplirá con todos los procedimientos razonables para la verificación de crédito establecidos por CTI para aceptar al suscriptor.*" ■ Ciertamente lo esencial era que no se podía otorgar un contrato de servicio si Celulares Telefónica no lo aprobaba con antelación. Por lo tanto, la decisión final descansaba en Celulares Telefónica.

Resolvemos pues, que los apelantes dependían de que Celulares Telefónica aprobara los suscriptores referidos. Los apelantes eran unos intermediarios que tenían la obligación de verificar el crédito de los clientes potenciales, pero, en última instancia, no eran quienes extendían el mismo.

De igual forma, no es un elemento significativo en esta controversia si los apelantes otorgaban un descuento a los equipos celulares, pues ello era una prerrogativa de ellos y no una obligación contractual. Por ende, en nada abona al argumento de los apelantes de que tuvieran la autoridad para concluir los contratos. Tampoco es revelador que los apelantes pudieran perder su comisión si el suscriptor desistía del servicio dentro de los primeros 150 días de uso, ya que, como se sabe, la doctrina jurídica vigente entiende que ello, por sí sólo, no es suficiente riesgo para poder ser considerado como un distribuidor. ■

Por su parte, los apelantes señalan que ellos tenían que mantener un inventario de teléfonos celulares en su tienda, de suerte que el suscriptor adquiriera y recibiera a través del mismo el servicio radio celular. Argumentan que Celulares Telefónica derivaba beneficio económico, pues eran ellos, los apelantes, los que tenían que hacer la inversión monetaria para tener un inventario de teléfonos. Como consecuencia de esto, aducen que Celulares Telefónica tenía un beneficio por ahorro en inversión. Destacan además, que dicho equipo celular era un elemento instrumental para la distribución del servicio de radio celular.

Ahora bien, recordemos que no había convenio contractual que precisara que los apelantes tuvieran que mantener tal inventario. El contrato era uno de servicios, no productos, por lo que la adquisición de los equipos fue una medida que los apelantes adoptaron para beneficio propio, no para cumplir con un mandato contractual con Celulares Telefónica.

Por otro lado, los apelantes explican que los costos de promoción para el servicio se compartían con Celulares Telefónica. No obstante, conviene puntualizar, que de la letra del contrato no surge el deber de llevar a cabo tal publicidad. Si bien los apelantes contribuían a la promoción del servicio, la doctrina jurídica vigente ha resuelto que este factor sólo no es suficiente para considerarlos distribuidores bajo la Ley 75. ■

Asimismo, reiteramos que los apelantes no podían modificar los términos del contrato de los suscriptores con la apelada ni tenían autoridad para conceder crédito.

A la luz de los criterios anteriormente esgrimidos, resolvemos que para propósitos de la Ley 75 los apelantes no son distribuidores. Actuó correctamente el TPI al declarar con lugar la moción de sentencia sumaria. No existía controversia en cuanto a los hechos materiales del caso de autos y, como cuestión de derecho, procedía la utilización del mecanismo de la sentencia sumaria.

Conforme a lo expuesto, concluimos que no se cometió el error señalado.

## V

Por los fundamentos expresados, se confirma la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 87

**1.** La división de telefonía celular de la Puerto Rico Telephone Company era conocida como Celulares Telefónica. Actualmente opera bajo el nombre comercial de Verizon Wireless.

**2.** Artículo 8 del Contrato de Distribuidor.

**3.** Artículo 2 del Contrato de Distribuidor.

**4.** Artículo 2 del Contrato de Distribuidor.

**5.** Artículo 5 del Contrato de Distribuidor.

**6.** Exhibit A del Acuerdo de Distribuidor.

**7.** Artículo 5 del Contrato de Distribuidor.

**8.** Artículo 9 del Contrato de Distribuidor.

**9.** Artículo 4 del Contrato de Distribuidor.

**10.** Véase la "*Certificación*" en el documento titulado "*Solicitud de Servicio Celular*" de Celulares Telefónica.

**11.** *Id.*

**12.** Artículo 1213 del Código Civil, 31 L.P.R.A. sec. 3391

**13.** Artículo 4 del Contrato de Distribuidor.

**14.** *Roberco, Inc. y Colón v. Oxford Inds., Inc., supra.*

**15.** Artículo 2 del Contrato de Distribuidor.